## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

JUDY ANN RIOS,

        Plaintiff,

        v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security,[1]

        Defendant.

No. 12 C 6470

Magistrate Judge Mary M. Rowland

## MEMORANDUM OPINION AND ORDER

Plaintiff Judy Rios filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq, 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and have filed cross motions for summary judgment.[2] For the reasons stated below, the Commissioner's decision is remanded for further proceedings consistent with this opinion.

---

[1] On February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security and is substituted for her predecessor, Michael J. Astrue, as the proper defendant in this action. Fed. R. Civ. P. 25(d).

[2] Although Plaintiff filed a reply purportedly in support of her motion for summary judgment, most of the brief contains information related to another claimant's request for benefits. (Dkt. 30).

# I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001).[3] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a

---

[3] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

## II. PROCEDURAL HISTORY

Plaintiff applied for SSI and DIB on September 15, 2009, alleging that she became disabled on February 28, 2006, because a combination of bipolar disorder, mood swings, depression, and anxiety prevented her from working. (R. at 11, 107, 108, 154, 158, 226). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id*. at 11, 107–10, 116–38). On April 5, 2011, Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id*. at 11, 58–106). The ALJ also heard testimony from Larry M. Kravitz, Ph.D., a medical expert (ME), and Thomas A. Gusloff, a vocational expert (VE). (*Id*.)

The ALJ denied Plaintiff's request for benefits on May 25, 2011. (R. at 11–20). Applying the five-step sequential evaluation process, the ALJ found, at step one, that Plaintiff had not engaged in substantial gainful activity since February 28, 2006, the alleged onset date. (*Id*. at 13). At step two, the ALJ found that Plaintiff's bipolar disorder, posttraumatic stress disorder, and polysubstance abuse with physiological dependence, in reported remission, are severe impairments. (*Id*.). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. (*Id*. at 14–15).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she has the RFC to perform a full range of work at all exertional levels with some nonexertional limitations: "her work should be limited to simple, routine, and repetitive tasks requiring only brief and superficial interaction with the public and/or co-workers." (R. at 15). At step four, the ALJ determined that Plaintiff is unable to perform any past relevant work. (*Id*. at 18–19). At step five, based on Plaintiff's RFC, age, education and work experience, and the VE's testimony, the ALJ determined that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including counter supply worker, industrial cleaner, and laundry laborer. (*Id*. at 19–20). Accordingly, the ALJ concluded that Plaintiff was not suffering from a disability as defined by the Act. (*Id*. at 20).

The Appeals Council denied Plaintiff's request for review on June 25, 2012. (R. at 1–3). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

### III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. § 404.1520(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). The Court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

# IV. MEDICAL EVIDENCE

Plaintiff was initially diagnosed with bipolar disorder in 1989. (R. at 396). She was prescribed Prozac[5] in 2001, and by January 2004, she was taking Zyprexa.[6] (*Id.* at 317, 321). Plaintiff asserts that by February 28, 2006, her bipolar disorder prevented her from working full time. (*Id.* at 226).

On March 9, 2007, Nagarakanti Nageswara Rao, M.D., found that Plaintiff was doing much better managing her bipolar disorder, and was able to sleep well. (R. at 343). Dr. Rao also noted that Plaintiff was alert and oriented, had no thought disorder, remained stable, and had an euthymic mood.[7] (*Id.*). He continued Plaintiff on Abilify.[8] (*Id.*)

On August 13, 2007, Plaintiff was admitted to Alexian Brothers Behavioral Health Hospital under the care of Mark Lerman, M.D. (R. at 396–98). Plaintiff had been manic for ten days prior to admission with decreased need for sleep, racing thoughts, irritability, and impaired judgment. (*Id.* at 396). Plaintiff was discharged ten days later on an unspecified study drug. (*Id.* at 397). Upon discharge, Plaintiff was euthymic, exhibited no perceptual abnormalities, and her thought process revealed no delusions. (*Id.*).

---

[5] Prozac (fluoxetine hydrochloride) is an antidepressant used to treat major depressive disorder and panic disorder. <http://www.rxlist.com/prozac-drug.htm>

[6] Zyprexa (olanzapine) is an antipsychotic used to treat bipolar I disorder and schizophrenia. <http://www.rxlist.com/zyprexa-drug/indications-dosage.htm>

[7] Euthymia is a normal, nondepressed, reasonably positive mood. <http://en.wikipedia.org/wiki/Euthymia>

[8] Abilify (aripiprazole) is a psychotropic drug that is used to treat schizophrenia and bipolar I disorder. <http://www.rxlist.com/abilify-drug.htm>

On March 31, 2009, Plaintiff was admitted to the Gateway Foundation complaining of depression and mental illness. (R. at 344–46). She reported taking Tegretol twice daily, and having taken Epitol previously.[9] (*Id.* at 345–46). Suzanne Pinto, Psy.D., opined that Plaintiff is emotionally depressed, socially withdrawn, uses self-deprecating language, sleeps excessively, has difficulty falling asleep, and is easily fatigued. (*Id.* at 384).

A month later, Plaintiff underwent a psychiatric evaluation by Balamoorti Gaonkar, M.D., who diagnosed her as stable and without mood swings. (R. at 340–41). He opined that when Plaintiff is depressed, she is isolative, does not want to do anything, does not shower, and feels hopeless and helpless. (*Id.*). He diagnosed bipolar I disorder, most recent episode depressed, in remission, and posttraumatic stress disorder, resolved. (*Id.* at 341).

On May 22, 2009, Plaintiff reported doing well despite missing a couple doses of Tegretol. (R. at 339). She returned to Gateway Foundation on July 10, 2009, for a psychological follow up with Dr. Gaonkar. (*Id.*). He noted Tegretol as Plaintiff's current medication, and observed that although she had been doing well, she was having mild mood swings. (*Id.*).

On October 1, 2009, Plaintiff underwent a psychiatric evaluation at Aunt Martha's Youth Service Center. (R. at 391–93). She reported having a fairly stable mood while medicated. (*Id.*). Her therapist concluded that Plaintiff has an euthymic affect

---

[9] Carbamazepine (Tegretol and Epitol) is an anticonvulsant used to treat bipolar disorder. <http://www.drugs.com/>

and low impulsivity. She was diagnosed with a bipolar disorder. (*Id.*). A month later, Plaintiff had a reactive affect and a depressed mood. (*Id.* at 390). Her therapist continued Tegretol and added Saphris.[10] (*Id.*). A month later, Plaintiff returned for a follow-up and was evaluated as stable with an euthymic affect, good judgment, and low impulsivity. (*Id.* at 389). In contrast, on January 14, 2010, Plaintiff was "very moody," with a reactive affect and moderate impulsivity. (*Id.* at 426–27). Saphris was discontinued and Plaintiff was started on Seroquel.[11] (*Id.* at 426). A month later, Plaintiff had an euthymic affect, good judgment, and low impulsivity. (*Id.* at 425). During this time period, Plaintiff frequently changed medications. (*Id.* at 427). For example, Plaintiff was taking Tegretol in October 2009, Saphris from November 2009 through February 2010, Seroquel in February 2010, and Tegretol from March through July 2010. (*Id.*).

On March 1, 2010, K. Neville, Ph.D., a DDS nonexamining physician, examined the record, including Plaintiff's allegations. (R. at 409). He opined that Plaintiff is mildly limited in activities of daily living and maintaining social functioning, moderately limited in maintaining concentration, persistence, or pace, and had no episodes of decompensation. (*Id.*). Dr. Neville also assessed the following moderate limitations:

> the ability to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek with-

[10] Saphris (asenapine) is an antipsychotic used to treat schizophrenia and bipolar disorder. <http://www.drugs.com/saphris.html>

[11] Seroquel (quetiapine fumarate) is a psychotropic drug used to treat schizophrenia and bipolar disorder. <http://www.rxlist.com/seroquel-drug.htm>

out interruptions from psychologically based symptoms and to perform
at a consistent pace without an unreasonable number of rest periods;
to respond appropriately to changes in the work setting; and to set re-
alistic goals or make plans independently of others.

(*Id.* at 413–14). Dr. Neville opined that Plaintiff's allegations are "partially credible as she tends to emphasize limitations and minimize strengths," but her "severity is not fully supported by [the medical evidence]." (*Id.* at 415). Dr. Neville concluded that Plaintiff "appears to be fairly stable on medication and able to function effectively with treatment," and "retains [the] capacity to function in a competitive setting." (*Id.*). On July 21, 2010, Terry A. Travis, M.D., another nonexamining DDS physician, affirmed Dr. Neville's findings. (*Id.* at 417–19). Dr. Travis noted that Plaintiff's allegations are only partially credible in light of the overall medical information, and she seems capable of carrying out her own daily activities without any significant limitations. (*Id.* at 419).

On March 25, 2010, at a follow-up visit with Aunt Martha's Youth Service Center, Plaintiff had a reactive, sad, and labile affect, but low impulsivity, and good judgment. (R. at 424). A month later, she was feeling better, with a euthymic affect, good judgment, and low impulsivity. (*Id.* at 423).

On June 25, 2010, Dr. Lerman evaluated Plaintiff and diagnosed her mood as manic with a labile affect. (R. at 430–31). He opined that she is fully oriented, alert but uncooperative, and irritated with extended questioning. (*Id.*). Her speech was rapid and loud, her thought process logical but rambling with hyperverbosity, and her thought content "positive for grandiose expansion." (*Id.*). Dr. Lerman diagnosed

bipolar I disorder, manic phase, with significant stress. (*Id.* at 431). Dr. Lerman discharged Plaintiff on an unspecified study drug. (*Id.*)

On July 15, 2010, Plaintiff was evaluated at Aunt Martha's with an euthymic affect and low impulsivity. (R. at 422). Her therapist discontinued Tegretol and restarted Seroquel. (*Id.*). On October 7, 2010, Plaintiff was stable, with an euthymic affect and low impulsivity. (Id. at 421). Three months later, Plaintiff was depressed, with a reactive, irritable, intense, and labile affect. (Id. at 437). Plaintiff's medication was switched again, this time from Seroquel to Celexa.[12] (Id.).

At the hearing, Plaintiff testified that her psychiatric medications would often cease to be effective, which would necessitate switching to a different prescription. (R. at 72). She described symptoms of being depressed, and reverting to acting like a teenager or child, characterized by immaturity and self-absorption. (*Id.* at 73). She reported frequent anxiety and the need to isolate herself when she is around a lot of people and noise. (*Id.* at 74).

Plaintiff also stated that she has manic episodes that last about seven to ten days, approximately twice a year, occurring before the end of a six-month prescription. (R. at 74–75, 94–95). She further testified to being easily irritated and having difficulty in handling frustration, which breaks her concentration. (*Id.* at 95–96).

---

[12] Celexa (citalopram hydrobromide) is a selective serotonin reuptake inhibitor (SSRI) indicated for the treatment of depression. <http://www.rxlist.com/celexa-side-effects-drug-center.htm>

## V. DISCUSSION

Plaintiff raises three arguments in support of her request to reverse and remand: the ALJ erred by (1) making an adverse credibility determination based on mischaracterized evidence; (2) failing to consider all portions of the medical record; and (3) relying on testimony from the vocational expert that was based on insufficient hypothetical questions. (Mot. 6–14). The Court addresses each argument in turn.

### A. The ALJ's Credibility Analysis

Plaintiff contends that the ALJ erred in making an adverse credibility determination by mischaracterizing evidence regarding her daily activities and failing to explain how the evidence concerning her brief part-time employment, her completion of minimal household chores and her communication with family members leads to his decision to discredit her claim of functional limitations. (Mot. 9–11).

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue,* 539 F.3d 668, 678 (7th Cir. 2008). In determining credibility, "an ALJ must consider several factors, including the claimant's daily activities, [her] level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d at 562 (citations omitted); *see* 20 C.F.R. § 404.1529(c); Social Security Ruling (SSR) 96-7p.[13] Even if a claimant's symptoms are not supported directly by the medical evi-

---

[13] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration."

dence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support claimant's credibility. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–540 (7th Cir. 2003). Indeed, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart,* 473 F.3d 816, 823 (7th Cir. 2007) (citation omitted); see 20 C.F.R. § 404.1529(c); SSR 96-7p.

Furthermore, the Court will uphold an ALJ's credibility finding if the ALJ gives specific reasons for that finding, supported by substantial evidence. *Moss v. Astrue,* 555 F.3d 556, 561 (7th Cir. 2009). The ALJ's decision "must contain specific reasons for a credibility finding; the ALJ may not simply recite the factors that are described in the regulations." *Steele,* 290 F.3d at 942 (citation omitted); *see* SSR 96-7p. "Without an adequate explanation, neither the applicant nor subsequent reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele,* 290 F.3d at 942. "An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce v. Colvin,* 739 F.3d 1046, 1051 (7th Cir. 2014).

---

*Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000) (internal citation and quotation omitted); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administering." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009) (emphasis in original).

On December 20, 2009, Plaintiff completed a Function Report. (R. at 250–58). She stated that she has no problems with personal care. (*Id.* at 251). She reported preparing her own meals, cleaning, ironing, shopping, and doing laundry. (*Id.* at 252–53). Plaintiff also reported going to church every Sunday and going out to dinner a couple times a month. (*Id.* at 254). She does lose concentration after a while. (*Id.* at 255).

Plaintiff completed a second Function Report on June 15, 2010. (R. at 277–89). In this report, Plaintiff reported insomnia, losing interest quickly with her activities, and difficulty leaving the house. (*Id.* at 277–78). She prepares her own meals but her daughter helps her with cleaning and laundry. (*Id.* at 279). Although she goes outside frequently, uses public transportation, attends church, visits friends, and shops for personal items, sometimes her illness causes her to avoid doing anything. (*Id.* at 280–82). Occasionally, Plaintiff has trouble talking, concentrating, and following instructions. (*Id.* at 282).

At her April 2011 hearing, Plaintiff testified that she lives with her daughter, son-in-law, and three grandchildren. (R. at 81). She last worked part time as an assistant to a chiropractor in June 2006, but had to leave due to her mania. (*Id.* at 83). She acknowledged abusing cocaine on occasion prior to March 2008. (*Id.* at 65, 84, 87). She spent time in jail in 2008 and 2009 for possession of a stolen vehicle. (*Id.* at 86).

At home, Plaintiff prepares small meals and manages her personal care, but her daughter does the laundry and cleaning. (R. at 68–69, 88–89). She used to do more

around the house until the numbness in her hands became a problem. (*Id.* at 70, 74). Although she saw a doctor many years ago for her numbness, she has been unable to lately because of lack of insurance. (*Id.* at 90). She occasionally reads but seldom leaves the house except to sit on the porch, attend AA meetings, or help her daughter shop for groceries. (*Id.* at 70, 88–90, 93). She has not attended church since 2009 or 2010. (*Id.* at 71).

Plaintiff testified that her financial situation makes it impossible for her to afford extensive mental health counseling. (R. at 66). She sees a psychiatrist monthly and takes medications to address her bipolar symptoms. (*Id.* at 66–67). Plaintiff reported four psychiatric hospitalizations. (*Id.* at 71–72). Her medications help for a while, but about every six months—when she enters a manic phase—they cease to help and she needs to switch prescriptions. (*Id.* at 72–75, 94–95). She reported that her medications cause occasional dizziness and trouble concentrating.[14] (*Id.* at 95–96).

In his decision, the ALJ made the following credibility determination:

> There is some question as to [Plaintiff's] credibility with regard to the issue of her alleged functional limitations due to various inconsistencies in the record. For example, as described above, she has reported that symptoms associated with her medically determinable impairments have caused significant functional limitations and represented that she is unable to sustain gainful employment. This is contradicted by evidence in the record [that Plaintiff] was at least briefly able to sustain part-time employment as a chiropractic assistant after the alleged onset date. Moreover, it is inconsistent with evidence that she can complete basic household chores, such as cleaning, cooking, and laundry with assistance from her daughter. Activity of this level does

---

[14] Dizziness is a common side effect of Celexa and Seroquel. <www.drugs.com>

not comport with [Plaintiff's] allegations as to symptom severity rela-
tive to her functional limitations. [Plaintiff] has further alleged that
symptomatology of her severe impairments has caused significantly
reduced social functioning. This is also contradicted by the record,
which reflects that she has normal relationships with her adult chil-
dren, talks to her family daily on the telephone, and attends church
weekly. Social functioning at this level is inconsistent with [Plaintiff's]
allegations regarding the severity of her symptoms and functional lim-
itations.

(R. at 16).

Although the ALJ clearly did a thorough job in this matter, the Court finds that

the ALJ did not adequately explain his reasoning for the adverse credibility finding.

Significantly, the ALJ did not address the medical evidence that supports Plaintiff's

testimony. *See Lopez*, 336 F.3d at 539–40 (ALJ cannot ignore medical evidence that

supports claimant's credibility). Although the medical records are sparse, Plaintiff's

testimony that she is unable to complete basic tasks or maintain regular attendance

at a place of employment is supported by medical records. (*See, e.g.*, R. at 396–98

(admitted to Alexian Brothers Behavior Health Hospital in August 2007 for mania,

decreased need for sleep, racing thoughts, irritability and impaired judgment), 384

(concluding in March 2009 that Plaintiff is emotionally depressed, socially with-

drawn, uses self-deprecating language, sleeps excessively, and easily fatigues), 340–

41 (concluding in April 2009 that Plaintiff is socially withdrawn, lacks any motiva-

tion, does not attend to personal hygiene, and feels hopeless and helpless, and diag-

nosing bipolar disorder), 430–31 (concluding in June 2010 that Plaintiff is manic

with a labile affect, alert but uncooperative and irritated, speech pattern rapid and

loud, thought process logical but rambling with hyperverbosity and positive for

grandiose expansion), 437 (opining in October 2010 that Plaintiff was depressed with a reactive, irritable, intense and labile affect)). Whether or not the ALJ ultimately decides this evidence renders Plaintiff's testimony credible, the ALJ is required to consider it when evaluating her credibility.

Furthermore, the ALJ does not explain why the evidence that he does cite—Plaintiff's four-month, part-time job, her ability to perform some routine household chores, and her relationships with her adult children—contradicts Plaintiff's testimony. In discrediting Plaintiff's assertion that her impairments prevent her from sustaining full-time employment, the ALJ cites Plaintiff's ability to sustain part-time employment as a chiropractic assistant for a brief period of time after her alleged onset date. (R. at 16). But the ALJ does not explain how Plaintiff working *part-time* for four months after her alleged onset date contradicts her allegation of being unable to maintain *full-time* employment. *See Jilinek v. Astrue*, 662 F.3d 805, 812 (7th Cir. 2011) ("[W]e are hard-pressed to understand how Jelinek's brief, part-time employment supports a conclusion that she was able to work a full-time job, week in and week out, given her limitations."). On the contrary, a claimant's "unsuccessful attempts to pursue various vocations might just as easily provide corroboration that [her] impairments significantly limited [her] ability to work, as opposed to evidence that [her] ability was greater than [she] alleged." *McKinzey v. Astrue*, 641 F.3d 884, 891 (7th Cir. 2011).

Similarly, the ALJ does not explain how Plaintiff's ability to complete basic household chores—with assistance from her daughter—undermines Plaintiff's con-

tention that she cannot sustain full-time employment. (*See* R. at 16). In December 2009, Plaintiff asserted that she was capable of preparing meals, cleaning, and doing laundry. (*Id.* at 252). By June 2010, she asserted that she was capable of cleaning and doing laundry only with her daughter's assistance. (*Id.* at 279). At the April 2011 hearing, Plaintiff testified that she cooks only minimally and that her daughter does all the laundry. (*Id.* at 88). "[A]lthough it is appropriate for an ALJ to consider a claimant's daily activities when evaluating [her] credibility, SSR 96-7p, at *3, this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). Indeed, the Seventh Circuit has "repeatedly cautioned that a person's ability to perform daily activities, especially if that can be done only with significant limitations, does not necessarily translate into an ability to work full-time." *Id.* "The critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . , and is not held to a minimum standard of performance, as she would be by an employer." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012); *see also Mendez v. Barnhart*, 439 F.3d 360, 362–63 (7th Cir. 2006) ("The pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work."). The ALJ has not explained how Plaintiff's minimal cooking contradicts her testimony that she is unable to maintain full-time employment.

Finally, the ALJ improperly discredited Plaintiff's allegation that her severe impairments caused reduced social functioning based on her testimony about normal relationships with her adult children, daily telephone calls with her family , and attending church. (R. at 16). First, while it was significant to the ALJ that the Plaintiff attended church weekly, the record indicates that at the time of the hearing, Plaintiff had stopped attending church, and had not attended with any regularity since 2009 or 2010. (R. at 71). Second, a claimant's ability to interact with family does not necessarily indicate that she is able to function socially. *See Hurlbut v. Astrue*, 11 C 6099, 2013 WL 2285802, at *6 (N.D. Ill. May 23, 2013) ("While it is true that Hurlbut can apparently maintain close relationships with his mother and a few relatives, for example, much of the record also shows that he experiences severe anxiety in public places and among strangers."); *Masciola v. Colvin*, No. 12 C 5738, 2014 WL 3611145, at *13 (N.D. Ill. July 22, 2014) ("Accepting a ride to church or to AA from a friend or family member in no way demonstrates a lack of credibility regarding Masciola's claims about an inability to work under and take direction from a supervisor.").

In sum, the ALJ did not provide sufficient reasoning from which the Court can discern how the record supports his finding that Plaintiff is not credible. This remand does not require that the ALJ find Plaintiff credible; rather, the ALJ is required to build an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002; *see Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("[W]e cannot uphold a decision by an administrative agency . . . if, while there is

enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."). Nevertheless, as the Seventh Circuit has instructed, a "flawed credibility assessment cannot be deemed harmless. An erroneous credibility finding requires remand unless the claimant's testimony is incredible on its face or the ALJ explains that the decision did not depend on the credibility finding." *Pierce*, 739 F.3d at 1051. Here, "[t]he ALJ did not provide a justification for his decision beyond that in his credibility finding, and [Plaintiff's] account of her [limitations] was not so contradicted by medical evidence as to be incredible. Nor can we be sure that the ALJ would have reached the same conclusion about [Plaintiff's] credibility if the information he considered had been accurate." *Id.*

## B. The ALJ Properly Assessed Dr. Kravitz's and Dr. Neville's Opinions

### 1. *Dr. Kravitz*

At the hearing, Dr. Kravitz opined that Plaintiff is capable of full-time work if she is limited to simple tasks and only superficial workplace contacts with no more than ordinary levels of work stress. (R. at 79). He also acknowledged that there are "times when [Plaintiff] is more symptomatic and time[s] when she is less symptomatic," and that "when she is in a full blown manic episode or depressive phase, I don't think she is going to be employed." (*Id.* at 80). In assessing the medical evidence, the ALJ gave Dr. Kravitz's opinion "great weight," finding it "wholly consistent with the medical evidence." (*Id.* at 18).

Plaintiff contends that the ALJ failed to "address the inconsistency in Dr. Kravitz's testimony," specifically the ME's opinion that Plaintiff is capable of full-time work but that when she is in a full-blown manic or depressive phase, she is not able to work. (Mot. 11–12). The Court finds no such inconsistency. On the contrary, Plaintiff's argument is based on a selective reading of the record. The ME went on to explain that if Plaintiff's full-blown manic or depressive phase happens only once a year or every two years, "that's not very often" and would not preclude employment. (R. at 80). Indeed, the ME found only "one to two" episodes of decompensation in the medical records spanning over ten years. (*Id.* at 78). The ALJ did not err in giving great weight to Dr. Kravitz's opinion.

### 2. *Dr. Neville*

In March 2010, Dr. Neville reviewed the medical record and completed a mental RFC form. (R. at 413–15). He found Plaintiff moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (*Id.* at 414). He went on to note that while Plaintiff "has some emotional lability," she "retains capacity for work type interaction." (*Id.* at 415). He further concluded that because of moderate limitations to Plaintiff's attention and concentration, she "would need occasional redirection to complete tasks." (*Id.*). Finally, while Plaintiff has a limited frustration tolerance, she "retains capacity to deal with change which is not dramatic or frequent." (*Id.*). In sum, Dr. Neville opined that Plaintiff "retains capacity to function in a competitive setting."

(*Id.*). The VE testified that a worker would be unable to sustain competitive employment if she were off task 15 to 20% of the work day. (*Id.* at 105). The VE also opined that employers will tolerate only two unexplained absences in a 30-day period. (*Id.* at 104). The ALJ afforded Dr. Neville's opinion "significant weight," finding it "generally consistent with the medical evidence of record," and supportive of the RFC. (*Id.* at 18).

Plaintiff contends that despite giving Dr. Neville's opinion significant weight, the ALJ failed to take into consideration Dr. Neville's finding that Plaintiff was moderately limited in her ability to complete a workday or workweek. (Mot. 12–13). Plaintiff argues that "[i]f the ALJ gave significant weight to Dr. Neville's opinion that [Plaintiff] has a moderate limitation in her ability to 'complete a normal workday and workweek without psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods,' the ALJ would have to explain how he concluded that [Plaintiff] could still work in light of the VE's testimony." (*Id.* at 13).

The Court finds otherwise. While Dr. Neville checked boxes on the RFC form to indicate that Plaintiff had moderate limitations in her ability to complete a normal workday and workweek (R. at 414), Dr. Neville found, in his functional capacity assessment, that Plaintiff retains the capacity for work type interaction and to deal with change that is not dramatic or frequent (*id.* at 415). Moreover, Dr. Neville concluded that Plaintiff "retains the capacity to function in a competitive setting." (*Id.* at 415). Thus, the ALJ properly considered Dr. Neville's narrative conclusion, not

the check-the-box items, in determining Plaintiff's RFC. *See Johansen v. Barnhart*, 314 F.3d 283, 288–89 (7th Cir. 2002) (ALJ properly relied upon narrative description of RFC in formulating hypothetical to VE); *Sawyer v. Colvin*, 512 F. App'x 603, 610 (7th Cir. 2013 (ruling that ALJ properly addressed moderate limitations because "these opinions were incorporated into [the state agency psychologist's] narrative assessment of [the claimant's] mental residual functional capacity, which the ALJ summarizes in his decision").

## C. Hypothetical Posed to the Vocational Expert

Plaintiff also argues that the ALJ posed an insufficient hypothetical to the VE. The ALJ adopted Dr. Kravitz's conclusion that Plaintiff has moderate difficulties in maintaining concentration, persistence, or pace. (R. at 14, 78). In his controlling hypothetical to the VE, the ALJ stated:

> For our first hypothetical questions, please assume a person of [Plaintiff's] age, education, work experience, and skill set who was able to perform work at all exertion levels and with no exertion limitations. This person's work would be limited to simple, routine, and repetitive tasks, while being able to carry out short and simple instructions with no more than ordinary levels of work stress. With only brief and superficial interaction with the public and with coworkers.

(R. at 102). Plaintiff contends that this hypothetical, particularly the section referring to "simple, routine work" does not adequately account for Dr. Kravitz's finding that Plaintiff is moderately limited in concentration, persistence, and pace. (Mot. at 7) (citing *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010)).

The Court disagrees. In *O'Connor-Spinner*, the ALJ determined that the claimant was moderately limited in concentration, persistence, and pace, but did not in-

clude this limitation in the controlling hypothetical. 627 F.3d at 617–18. Here, un-like in *O'Connor-Spinner*, the controlling hypothetical accurately tracked the ALJ's RFC determination. (*Compare* R. at 102 *with id.* at 15). Further, while the ALJ found that Plaintiff had moderate difficulties with concentration, and pace, he clear-ly noted that this determination was used only "to rate the severity of mental im-pairments at steps 2 and 3" and was "not a residual functional capacity assess-ment." (*Id.* at 15).

Nevertheless, on remand, the ALJ is cautioned that "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's lim-itations supported by the medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014). "Among the limitations the VE must consider are deficiencies in concen-tration, persistence, or pace." *O'Connor-Spinner*, 627 F.3d at 619. "Although it is not necessary that the ALJ use this precise terminology ('concentration, persistence and pace'), we will not assume that the VE is apprised of such limitations unless she has independently reviewed the medical record." *Yurt*, 758 F.3d at 857.

## D. Summary

In sum, the ALJ has failed to "build an accurate and logical bridge from the evi-dence to [his] conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings regarding credi-bility and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evi-dence. On remand, the ALJ shall reassess Rios's credibility. The ALJ shall then

reevaluate Rios's physical and mental impairments and RFC, considering all of the evidence of record, including Rios's testimony, and shall explain the basis of his findings in accordance with applicable rulings and regulations.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment [20] is **GRANTED** and Defendant's Motion for Summary Judgment [28] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: September 29, 2014

_____
MARY M. ROWLAND
United States Magistrate Judge